ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
CRAIG W. SMITH (164886)
csmith@robbinsarroyo.com
ASHLEY R. RIFKIN (246602)
arifkin@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DONALD JOHNSTON, Derivatively on Behalf of BANC OF CALIFORNIA, INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT |
| v. | |
| ROBERT D. SZNEWAJS, JONAH F. SCHNEL, HALLE J. BENETT, RICHARD J. LASHLEY, STEVEN A. SUGARMAN, JOHN C. GROSVENOR, CHAD T. BROWNSTEIN, JEFFREY KARISH, and ERIC L. HOLOMAN, | |
| Defendants, | |
| -and- | |
| BANC OF CALIFORNIA, INC., a Maryland Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.   This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Banc of California, Inc. ("Banc" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Banc's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Banc to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Banc is a financial holding company providing commercial banking products and services.   Until January 23, 2017, defendant Steven A. Sugarman ("Sugarman") was the Company's Chief Executive Officer ("CEO").   Defendant Sugarman was also responsible for the 2010 recapitalization of Banc while he was Managing Member of COR Capital LLC ("COR"), an investment management company. Defendant Sugarman also owned or controlled several COR-affiliated entities, including COR Securities Holdings Inc. and COR Fund Advisors LLC (collectively referred to as "COR").

3.      On October 18, 2016, the market research website SeekingAlpha.com (hereinafter "*Seeking Alpha*") published a blog post from an anonymous author.  The blog post alleged that there were nefarious ties between defendant Sugarman, Banc's former Lead Independent Director defendant Chad T. Brownstein ("Brownstein"), and a Los Angeles-based financier Jason Galanis ("Galanis").  Galanis had previously pled guilty to

- 1 -

several securities fraud crimes.  The revelation of this concealed relationship in the blog post caused the Company's stock to plummet by more than a quarter of its value in a single day.

4.    Also on October 18, 2016, the Company set out to calm the market by stating that it was aware of the Galanis allegations prior to the *Seeking Alpha* blog post. Upon learning of Galanis' use of Banc's name in furtherance of his schemes, the Company, under the direction of supposedly disinterested members of its Board of Directors (the "Board"), conducted a purportedly independent investigation.   Banc assured the investing public that in the course of the investigation, Banc found no ties between it and Galanis.

5.    But by January 2017, Banc revealed this investigation was tainted.   In reality, Banc's management directed the investigation, not "disinterested" directors, and it was conducted by a nonindependent law firm that had represented defendant Sugarman and Banc.   The Company convened a Special Committee to address the supposed improper relationships with Galanis and any transactions associated with him and Banc or Banc officials.   Banc also replaced the conflicted law firm with another that was independent.   Despite purportedly discrediting the allegations from the blog post in the separate Special Committee investigation, defendants Sugarman and Brownstein, as well as another executive Jeffrey T. Seabold ("Seabold"), resigned their positions.

6.    This, however, was just the beginning of the revelations about the improprieties occurring at the Company.   Banc insiders, including Seabold, soon filed actions against Banc alleging that the Board used the Galanis scandal to consolidate its power over Banc in a "power grab" and concealed their own conflicts of interest and accounting manipulations.   Another former officer made similar allegations and added that certain executives engaged in drug use and sexual activity while at work and used corporate funds inappropriately.

7.    As a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for

the Central District of California.   On September 6, 2017, U.S. District Judge Andrew J. Guilford denied the Banc and defendant Sugarman's motion to dismiss in part.  The court found that plaintiffs had sufficiently alleged certain statements from the Company's 2016 Proxy Statement (the "Proxy") were false and misleading, despite the heightened pleading standard contained in the Private Securities Litigation Reform Act.  In addition, Banc's dubious actions surrounding the investigation into the *Seeking Alpha* blog post caught the attention of the SEC.  On January 23, 2017, the Company reported that it was the subject of an ongoing SEC investigation, having received a formal investigative order and a subpoena related to internal investigation documents from the agency.

8.     In light of this wrongdoing, plaintiff sent a litigation demand letter to the Board on May 22, 2018 (the "Demand").   The Demand commanded the Board to investigate and initiate litigation against those responsible for the wrongdoing detailed herein.   While plaintiff offered to assist the Board in its purported investigation, the Board has done everything it could to stonewall and prevent any scrutiny of its actions.

9.     In communications regarding the Demand, counsel for the Company would purport to speak for the Board and vice versa.  Plaintiff also dealt with multiple counsels. Unclear who was in charge of the investigation or which counsel to interact with, plaintiff would ask for clarifying information only to be ignored. Counsel went so far as refusing to even identify the members of the supposed "Special Committee" that was investigating the Demand.

10.     Plaintiff received a perfunctory rejection letter on January 4, 2019.  Though there was little detail in the letter, it did reveal that despite previous claims of a "Special Committee," the reality was that the Board formed an "Ad Hoc Committee," that still had to provide its recommendation of next steps to a conflict Board.  Further, the rejection letter showed that the Board sat on the Demand for months before it even began its investigation.

11.     In light of these troubling facts, and the Company's admitted history of tainted investigations, plaintiff requested a limited set of books and records concerning

1   the investigation into the Demand, including the alleged report that the "Ad Hoc
2   Committee" provided to the Board.  However, as before, the Company stonewalled
3   plaintiff and refused to provide the demanded books and records.

4       12.   Plaintiff, in follow-up correspondence, explained that by the Company
5   refusing to provide the demanded books and records, it amounted to an improper attempt
6   to prevent scrutiny of the decision to reject the Demand, *citing City of Orlando Police*
7   *Pension Fund v. Page*, 970 F. Supp.2d 1022, 1030 (N.D. Cal. 2013).  Nevertheless, the
8   defendants persisted in blocking any review of the Board or "Ad Hoc Committee's"
9   investigation by refusing to provide any books and records about the investigation,
10  including the purported report the Ad Hoc Committee provided to the Board.

11      13.   In light of the Board's bad faith refusal to act, plaintiff now brings this action
12  against the Individual Defendants (as defined herein) to repair the harm that they caused
13  with their faithless actions.

14                              **JURISDICTION AND VENUE**

15      14.   Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the
16  parties exists and the amount in controversy exceeds $75,000, exclusive of interests and
17  costs.

18      15.   This Court has jurisdiction over each defendant named herein because each
19  defendant is either a corporation that conducts business in and maintains operations in
20  this District, or is an individual who has sufficient minimum contacts with this District to
21  render the exercise of jurisdiction by the District courts permissible under traditional
22  notions of fair play and substantial justice.

23      16.   Venue is proper in this Court in accordance with 28 U.S.C. §1391 because:
24  (i) Banc maintains its principal place of business in this District; (ii) one or more of the
25  defendants either resides in or maintains executive offices in this District; (iii) a
26  substantial portion of the transactions and wrongs complained of herein, including the
27  defendants' primary participation in the wrongful acts detailed herein, and aiding and
28  abetting and conspiracy in violation of fiduciary duties owed to Banc, occurred in this

                                        - 4 -

District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

17.     Plaintiff Donald Johnston was a stockholder of Banc at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Banc stockholder.  Plaintiff is a citizen of Ohio.

**Nominal Defendant**

18.     Nominal Defendant Banc is a Maryland corporation with principal executive offices located at 3 MacArthur Place, Santa Ana, California.  Accordingly Banc is a citizen of Maryland and California.  Banc is a financial holding company that conducts business through its sole subsidiary, Banc of California, National Association (the "Bank").  The Bank operates thirty-two branch locations that provide core banking products and services to private businesses, entrepreneurs, and communities throughout California.  As of December 31, 2018, the Company had 741 full- and part-time employees.

**Defendants**

19.     Defendant Robert D. Sznewajs ("Sznewajs") is Banc's Chairman of the Board and has been since January 2017; a Banc director and has been since at least December 2013; and a director of the Bank and has been since 2013.  Defendant Sznewajs is also a member of the Company and Bank's Joint Audit Committee and has been since at least April 2015, and was the Chairman of the Joint Audit Committee from at least April 2015 to at least February 2017.  Defendant Sznewajs knowingly or recklessly made improper statements in the Proxy.  He was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into defendant Sugarman's connections with Galanis.  Defendant Sznewajs also knew about the alleged connections between Galanis and Company officers and directors, most notably defendant Sugarman since at least 2015.  Defendant Sznewajs was part of the

initial Special Committee created to investigate the allegations raised in the *Seeking Alpha* blog post, despite the blog specifically identifying Sznewajs time as CEO of West Coast Bank, which received a cease and desist order in 2009 from regulators due to "management whose policies and practices are detrimental to the bank." Defendants Sznewajs, as Chairman of the Joint Audit Committee, received a letter from KPMG LLP ("KPMG"), the Banc's independent auditor, about the allegations of "inappropriate relationships with third parties," on October 27, 2016. Defendant Sznewajs also would have overseen the "reassessment" for accruals for 2016 bonuses. Banc paid defendant Sznewajs the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $141,875 | $143,760 | - | $6,337 | $291,972 |
| 2017 | $172,904 | $140,000 | - | $8,737 | $321,641 |
| 2016 | $130,000 | $120,003 | - | $7,416 | $257,419 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Sznewajs is a citizen of Arizona.

20.   Defendant Jonah F. Schnel ("Schnel") is a Banc director and has been since April 2013, and a director of the Bank and has been since October 2013. Defendant Schnel is also a member of the Company and the Bank's Joint Nominating and Corporate Governance Committee and has been since at least February 2017. Defendant Schnel was a member of the Company and the Bank's Joint Audit Committee from at least April 2015 to at least April 2016; and a member of the Company and Bank's Joint Compensation, Nominating and Corporate Governance Committee from at least April 2015 to at least April 2016. Defendant Schnel knowingly or recklessly made improper statements in the Proxy. He was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into defendant Sugarman's connections with Galanis. Defendant Schnel also knew about the alleged connections between Galanis and Company officers and directors, most notably defendant Sugarman since at least 2015. Defendant Schnel was one of the members of the initial Special

Committee, even though defendant Schnel was a partner with defendant Brownstein and founded a business together, as revealed in the *Seeking Alpha* blog post.  Defendant Schnel also would have overseen the "reassessment" for accruals for 2016 bonuses.  Banc paid defendant Schnel the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $102,500 | $102,500 | - | $7,838 | $212,838 |
| 2017 | $134,147 | $102,500 | - | $10,986 | $247,633 |
| 2016 | $140,833 | $184,312 | - | $8,504 | $333,649 |
| 2015 | $130,000 | $110,000 | $19,999 | $5,563 | $265,562 |

Defendant Schnel is a citizen of California.

21.     Defendant Halle J. Benett ("Benett") is a Banc director and has been since May 2014, and a director of the Bank and has been since December 2013.  Defendant Benett is also a member of the Company and the Bank's Joint Audit Committee and has been since at least February 2017; and the Chairman of the Company and the Bank's Joint Nominating and Corporate Governance Committee and has been since at least February 2017.  Defendant Benett was the Vice Chairman of the Company and the Bank's Joint Audit Committee in at least February 2017.  Defendant Benett knowingly or recklessly made improper statements in the Proxy.  He was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into defendant Sugarman's connections with Galanis.  Defendant Benett also knew about the alleged connections between Galanis and Company officers and directors, most notably defendant Sugarman, since at least 2015.  Defendant Benett was one of the members of the initial Special Committee, even though defendant Benett was an investment banker with Keefe, Bruyette & Woods, a firm that Banc paid millions of dollars for its services, as revealed in the *Seeking Alpha* blog post.  Defendant Benett also would have overseen the "reassessment" for accruals for 2016 bonuses.  Banc paid defendant Benett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $103,750 | $103,760 | - | $5,747 | $213,257 |
| 2017 | $136,555 | $103,750 | - | $7,919 | $248,224 |
| 2016 | $113,333 | $110,012 | - | $6,688 | $230,033 |
| 2015 | $110,000 | $90,008 | $19,999 | $4,551 | $224,558 |

Defendant Benett is a citizen of New York.

22.     Defendant Richard J. Lashley ("Lashley") is a Banc director and a director of the Bank and has been since February 2017.  Defendant Lashley is also a member of the Company and the Bank's Joint Audit Committee and has been since February 2017; and a member of the Company and the Bank's Joint Nominating and Corporate Governance Committee and has been since at least February 2018.  Defendant Lashley would have overseen the "reassessment" for accruals for 2016 bonuses.  Former Banc Small Business Administration Managing Director Heather Endresen ("Endresen") stated that she complained directly to defendant Lashley about the justification and validity of the bonus changes.   Banc paid defendant Lashley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $105,000 | $105,000 | $210,000 |
| 2017 | $87,937 | $105,000 | $192,937 |

Defendant Lashley is a citizen of New Jersey.

23.     Defendant Sugarman was Banc's President from November 2013 to January 2017; CEO from September 2012 to January 2017; and a director from November 2010 to January 2017.  Defendant Sugarman was also the Bank's President and CEO from November 2013 to January 2017, and a director of the Bank from November 2010 to January 2017.  Defendant Sugarman is named as a defendant in the related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Sugarman knowingly, recklessly, or with gross

- 8 -

negligence made improper statements in the Proxy.   Defendant Sugarman was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into his connections with Galanis.   Banc paid defendant Sugarman the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Stock Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------------|----------------------------------------|------------------------|-------|
| 2017 | $85,128 | - | $4,053,731 | $56,835 | - | $2,589,506 | $6,785,200 |
| 2016 | $748,590 | $1,500,000 | $5,500,032 | - | $2,250,000 | $114,755 | $10,113,377 |
| 2015 | $600,000 | $250,000 | $1,499,998 | $5,114 | - | $216,198 | $2,571,310 |

Defendant Sugarman is a citizen of California.

24.   Defendant John C. Grosvenor ("Grosvenor") was Banc's General Counsel Emeritus from May 2018 to April 2019; Executive Vice President and General Counsel from August 2012 to May 2018; and Corporate Secretary from June 2014 to May 2018. Defendant Grosvenor was also the Bank's Executive Vice President, General Counsel, and Corporate Secretary from at least February 2018 to May 2018.   Defendant Grosvenor knowingly, recklessly, or with gross negligence made improper statements concerning the investigation into defendant Sugarman's ties to Galanis.   Banc paid defendant Grosvenor the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Stock Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------------|----------------------------------------|------------------------|-------|
| 2017 | $500,000 | - | $269,694 | - | $131,875 | $28,598 | $930,167 |
| 2016 | $501,378 | - | $400,045 | - | $200,000 | $34,431 | $1,135,854 |
| 2015 | $389,583 | $400,000 | $400,001 | $238,200 | - | $145,315 | $1,573,099 |

Defendant Grosvenor is a citizen of California.

25.   Defendant Brownstein was Banc's Vice Chairman of the Board and Lead Independent Director from 2014 to February 2017; and a Banc director from May 2011 to February 2017.   Defendant Brownstein was also a director of the Bank from 2013 to February 2017.  Defendant Brownstein was the Chairman of the Company and the Bank's Joint Compensation, Nominating and Corporate Governance Committee from at least April 2015 to at least April 2016.  Defendant Brownstein knowingly or recklessly made

- 9 -

improper statements in the Proxy.  Defendant Brownstein was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into his and defendant Sugarman's connections with Galanis.  Defendant Brownstein was one of the main targets of the *Seeking Alpha* blog post.  According to the blog, an investment firm run by defendant Brownstein was a major investor in Prospect Global Resources, Inc. ("Prospect Global"), an entity which the SEC identified as a company Galanis controlled, and to which Galanis funneled money obtained through his frauds. Banc paid defendant Brownstein the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $24,167 | $372,146 | - | $2,986 | $399,299 |
| 2016 | $182,917 | $180,041 | - | $9,684 | $372,642 |
| 2015 | $160,000 | $140,003 | $19,999 | $7,080 | $327,082 |

Defendant Bronstein is a citizen of California.

26.     Defendant Jeffrey Karish ("Karish") was a Banc director from October 2011 to May 2018.  Defendant Karish was also a director of the Bank from 2013 to May 2018. Defendant Karish was a member of the Company and the Bank's Joint Audit Committee from at least April 2015 to May 2018.  Defendant Karish knowingly or recklessly made improper statements in the Proxy.  He was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into defendant Sugarman's connections with Galanis.  Defendant Karish also knew about the alleged connections between Galanis and Company officers and directors, most notably defendant Sugarman, since at least 2015.  Defendant Karish was one of the members of the Special Committee that initially reviewed allegations in the *Seeking Alpha* blog post, despite being a director at Digital Turbine with a family member of defendant Sugarman. Defendant Karish would have overseen the "reassessment" for accruals for 2016 bonuses. Banc paid defendant Karish the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $41,667 | $344,401 | - | $3,354 | $389,422 |
| 2017 | $133,430 | $100,000 | - | $8,464 | $241,894 |
| 2016 | $124,167 | $110,012 | - | $7,349 | $241,528 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Karish is a citizen of California.

27.   Defendant Eric L. Holoman ("Holoman") was a Banc director from July 2013 to June 2017.  Defendant Holoman was also a director of the Bank from 2013 to June 2017.  Defendant Holoman was the Vice Chairman of the Company and the Bank's Joint Nominating and Governance Committee in at least February 2018; and a member of the Company and the Bank's Joint Compensation, Nominating and Governance Committee from at least April 2015 to at least April 2016.   Defendant Holoman knowingly or recklessly made improper statements in the Proxy.  He was also responsible for the October 18, 2016 press release that falsely claimed the Board oversaw an investigation into defendant Sugarman's connections with Galanis.  Defendant Holoman also knew about the alleged connections between Galanis and Company officers and directors, most notably defendant Sugarman, since at least 2015.  Defendant Holoman was one of the members of the Special Committee that initially reviewed allegations in the *Seeking Alpha* blog post, though he left before the Special Committee finished its investigation.  Defendant Holoman would have overseen the "reassessment" for accruals for 2016 bonuses.   Banc paid defendant Holoman the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $64,335 | $397,703 | - | $4,668 | $466,706 |
| 2016 | $130,000 | $120,003 | - | $7,416 | $257,419 |
| 2015 | $120,000 | $100,004 | $19,999 | $5,057 | $245,060 |

Defendant Holoman is a citizen of California.

28.     The defendants identified in ¶¶23-24 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶19-23, 25-27 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶19-20, 22, 26 are referred to herein as the "Joint Audit Committee Defendants."   Collectively, the defendants identified in ¶¶19-27 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Banc and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Banc in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Banc and not in furtherance of their personal interest or benefit.

30.     To discharge their duties, the officers and directors of Banc were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Banc were required to, among other things:

(a)     fully and fairly disclose any conflicts of interests or other facts that may harm the Company to its stockholders, and take action to prevent any such harm from occurring;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Banc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

31.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Banc, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make the improper statements, adjust the bonus accruals, and conduct improper practices that caused Banc to incur substantial damage.

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Banc, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Banc has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Joint Audit Committee Defendants**

34.     In addition to these duties, under the Joint Audit Committee Charter in effect since 2016, defendants Karish, Schnel, Sznewajs, and Lashley, owed specific duties to Banc to assist the Board in overseeing the integrity of the Company's financial statements and financial accounting practices.   In particular, the Audit Committee's Charter provides:

PURPOSE.

The Committee is appointed by the Board to assist the Board in the following oversight functions for the Company, and other such responsibilities as may be delegated to it by the Board, including:

• Monitoring and oversight of the integrity of the Company's financial statements and financial accounting practices;

- 13 -

- Monitoring and oversight of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;

- Monitoring and oversight of the effectiveness of the Company's internal control over financial reporting;

- Monitoring and oversight of the Company's compliance with legal and regulatory requirements;

- Monitoring and oversight of the qualifications and independence of the Company's internal auditors and independent registered public accounting firm; and

- Monitoring and oversight of the performance of the Company's internal audit function and independent registered public accounting firm.

*   *   *

This Committee shall have the authority to investigate any matter brought to its attention and shall have full access to all books, records, facilities and personnel of the Company and its subsidiaries, direct access to the independent registered public accounting firm and the power to retain independent legal, accounting, or other advisors or experts for this or any other purpose. The Company shall provide for appropriate funding, as determined by the Committee, for the payment of compensation to independent advisors to the Committee, for the payment of compensation to the independent registered public accounting firm for the purpose of rendering or issuing an audit report or performing other audit, review or attest services for the Company and for the payment of ordinary administrative expenses of this Committee that are necessary or appropriate in carrying out its duties. The Committee shall annually evaluate its own performance.

\* \* \*

Review with the Board of Directors any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent registered public accounting firm or the performance of the internal audit function.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Banc, regarding the Individual Defendants' management of Banc's operations and connections with known criminals; and (ii) enhance the Individual Defendants' executive and directorial positions at Banc and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, the Individual Defendants caused the Company to issue improper financial statements.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future

- 15 -

1  business prospects.

2      39.    The Individual Defendants accomplished their conspiracy, common

3  enterprise, and/or common course of conduct by causing the Company to purposefully or

4  recklessly release improper statements.  Because the actions described herein occurred

5  under the authority of the Board, each of the Individual Defendants was a direct,

6  necessary, and substantial participant in the conspiracy, common enterprise, and/or

7  common course of conduct complained of herein.

8      40.    Each of the Individual Defendants aided and abetted and rendered

9  substantial assistance in the wrongs complained of herein.  In taking such actions to

10  substantially assist the commission of the wrongdoing complained of herein, each

11  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

12  assisted in the accomplishment of that wrongdoing, and was aware of his overall

13  contribution to and furtherance of the wrongdoing.

14  ### *SEEKING ALPHA* ALLEGES MATERIAL TROUBLING FACTS ABOUT THE
15  ### COMPANY'S THEN CEO—DEFENDANT SUGARMAN

16      41.    In the midst of the postrecession economy, COR, led by defendant

17  Sugarman, intervened in the Company with an infusion of $60 million.  Through this

18  intervention effort, defendant Sugarman became Banc's CEO in September 2012.

19  Seabold, who had assisted Sugarman in the intervention effort, became an employee of

20  Banc's predecessor, First PacTrust Bancorp, Inc., and later an Executive Vice Chairman

21  of the newly-formed Company.  Since that time, the Company has grown to include more

22  than $10 billion in assets.

23      42.    The October 18, 2016 *Seeking Alpha* blog post, written by a short seller

24  under the pseudonym Aurelius, sought to reveal connections between the Company's top

25  executives and Galanis.  The blog post, titled "BANC: Extensive Ties, to Notorious

26  Fraudster Jason Galanis Make Shares Un-Investible," reportedly showed that Galanis had

27  substantial ties to Banc and its fiduciaries.  In particular, the blog post asserted that

28  Galanis used a network of related corporations and limited liability companies with ties

to Sugarman, COR, and other Banc insiders to effectively control Banc.  The blog post's author stated that Galanis used an off-balance sheet lender controlled by defendant Sugarman and Banc executives to finance his various fraudulent schemes and transfer fraudulently-obtained assets.  Further, the blog post alleged that defendant Brownstein had material financial ties to defendant Sugarman and Banc that compromised his independence when approving related-party transactions financially benefiting defendant Sugarman and his family.

43.    The connections to Galanis were disconcerting due to his publicly-known fraudulent dealings.  On September 24, 2015, the U.S. Department of Justice ("DOJ") and the SEC charged Galanis with perpetrating various securities fraud schemes bilking investors of millions of dollars.  Specifically, Galanis was indicted for a scheme to defraud stockholders of Gerova Financial Group, Ltd. ("Gerova") by secretly obtaining millions of Gerova shares.  Galanis and his cohorts manipulated the stock's value by generating demand through bribed investment advisors who purchased Gerova stock for their clients that were sold by Galanis and others.  Galanis pled guilty in July 2016, and was, sentenced to eleven years in prison in February 2017.

44.    While still out on bail for his participation in the Gerova fraud, the DOJ and SEC charged Galanis with additional crimes surrounding a Ponzi scheme defrauding investors and a Native American tribal entity of tens of millions of dollars (the "Tribal Bond Scheme").  From 2012 to 2016, Galanis and his coconspirators, which included former director at COR Hugh Dunkerley ("Dunkerley"), induced the Native American tribal entity to issue bonds.  The Native American tribal entity issued the bonds under false pretenses as an unwitting pawn.  Galanis hid material facts about the bonds, including their lack of liquidity.  Galanis kept the bond proceeds and used them for his personal expenses.  He pled guilty to the Tribal Bond Scheme in January 2017.  On August 11, 2017, Galanis received a fourteen-year prison sentence for defrauding the Native American tribal entity and numerous pension fund investors.

45.     According to the *Seeking Alpha* blog post author, defendant Sugarman-owned COR and Galanis together controlled an offshore insurance company, Valor Group Ltd. ("Valor"), used in the Tribal Bond Scheme.  The SEC found that Galanis financed the bribery of investment managers through Valor and its subsidiaries.  Jason Sugarman, defendant Sugarman's brother, was Chairman and CEO of Valor at the time. Jason Sugarman also had ties to Banc as one of its hired consultants.

46.     Valor had further connections to defendant Sugarman's COR.  Another COR director, Dunkerley, served as Valor's President while still employed at COR.  A Valor subsidiary, the COR-owned Wealth-Assurance AG, reportedly also played a role in the Tribal Bond Scheme.  In addition, Burnham Securities Inc., part of COR and operating in the same building as Banc's corporate headquarters, acted as placement agent during the Tribal Bond Scheme.

47.     The *Seeking Alpha* blog post noted that the SEC investigation found Galanis used COR as a front in furtherance of the Tribal Bond Scheme.  For example, the SEC uncovered an e-mail from Galanis to a coconspirator that attached a document titled "Introduction to COR Capital" to create the impression of COR's financial backing. Galanis represented to coconspirators that he controlled COR and its affiliates and installed officers at COR to hide his control externally.

48.     The *Seeking Alpha* blog post further implicated defendant Sugarman with entities involved in both the Tribal Bond Scheme and Gerova fraud.  For instance, defendant Sugarman held a majority of JAS Partners 1, LLC ("JAS Partners"), which in turn controlled Camden Capital Partners, LLC and lender Camden Real Estate Opportunity Fund I, LLC (collectively, "Camden") along with Seabold.  Camden financed Galanis during his perpetration of the Tribal Bond Scheme.  Based on the *Seeking Alpha* blog post author's research, Galanis also used Camden in transactions during the Gerova fraud.

49.     Last, the *Seeking Alpha* blog post's author tied Galanis with defendant Brownstein, Banc's Lead Independent Director at the time.  Particularly, defendant

Brownstein's private investment firm was a chief investor in Prospect Global. Defendant Brownstein served as Vice Chairman of Prospect Global. Pointing to the SEC complaint in the Gerova prosecution, Galanis controlled Prospect Global and used the entity to hold fraudulently obtained proceeds.

**THE INDIVIDUAL DEFENDANTS' TAINTED RESPONSE**

50.     As far back as 2015, Banc's management knew of these supposed connections between the Company, defendants Sugarman and Brownstein, and the serial fraudster Galanis. The Company's management convened an internal investigation into Galanis' control over COR. Through this investigation, Banc management became aware of not only Galanis' troubled history with white collar crime, but his use of Banc's goodwill and name in furtherance of his schemes while running them from COR offices. Instead of making its findings public, Banc fiduciaries concealed the impact of this internal investigation from investors at the expense of the Company's integrity and reputation.

51.     On the same day as the *Seeking Alpha* blog post's publication, October 18, 2016, Banc issued a response. In the public announcement following the revelations, Company fiduciaries admitted that they were aware of the Galanis allegations for at least a year. They assured the public that it had convened an investigation, claiming that the proceedings were "independent" and at the behest of "[d]isinterested" Board members. The release, attached to Banc's Current Report on Form 8-K filed with the SEC, stated that the investigation did not uncover any ties between defendant Sugarman, Banc, and Galanis.

52.     The press release also stated that "the Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation" of the Galanis allegations, and that the Board had received "regular reports" from Winston & Strawn LLP ("Winston & Strawn") during its review.

53.    The Company also held an earnings conference call to discuss its third quarter 2016 financial results on October 19, 2016.  During the call, defendant Grosvenor stated the following concerning the "Board's" investigation:

> As discussed in our press release yesterday, management first advised the Board of Directors in 2015 regarding the facts then known pertaining to the circumstances associated with Jason Galanis's indictment, including certain claims attributed to Galanis that he was affiliated in some manner with the Company or members of the Company's Board of Directors or management.

> In response, the Board of Directors determined to retain outside counsel to independently investigate the matters raised and report any information that might indicate the possible existence of any potential impropriety. The results of that investigation, which has continued over the course of more than a year, failed to disclose any ownership interest by Galanis in the Company or the Bank, and affirmatively confirmed that he exercised no direct or indirect control over the Company or the Bank or any entity owned or affiliated with Steven Sugarman or any other member of the Board of Directors.

54.    As the Company would later admit, in reality, conflicts of interest tainted the first internal investigation process.  Disinterested directors did not direct the investigation.  Instead, the impetus came from Company "management," including the same individuals that were the subject of the investigation.  The law firm hired to conduct the supposed independent investigation, Winston & Strawn, had been hired as personal counsel for defendant Sugarman and the Company.

55.    Repercussions for the Company continued shortly after this announcement. Banc's independent auditor, KPMG, raised concerns to the Board regarding the inappropriate, undisclosed relationships on October 27, 2016, in a letter to director, defendant Sznewajs, the Chairman of the Joint Audit Committee during this time.  The

Company formed a Special Committee based on KPMG's letter to conduct yet another investigation into potential wrongdoing stemming from ties with Galanis.  Pursuant to Seabold's wrongful termination suit, the Special Committee consisted of defendants Sznewajs, Schnel, Karish, Benett, and Holoman.  The Special Committee's investigation delayed the filing of the Company's Quarterly Report on Form 10-Q for the third quarter of 2016 with the SEC.

56.    On January 23, 2017, Company fiduciaries admitted that their response to the *Seeking Alpha* blog post was inherently flawed.  Contrary to prior assertions that the investigation was independent, the Company admitted management's involvement.  In response, the Company finally engaged a supposedly "independent" law firm, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), to replace the conflicted Winston & Strawn.  The Company disclosed that WilmerHale found on a preliminary basis that there was no evidence that Galanis controlled Banc, but did not reach a conclusion regarding connections between defendants Sugarman and Brownstein, and the fraudster Galanis.  In the announcement, the Company further revealed that its botched first investigation drew the attention of the SEC, which issued a formal order of investigation on January 12, 2017.

57.    Despite the Special Committee and WilmerHale's findings of no connection between Banc and Galanis, the Company announced defendant Sugarman's resignation on January 23, 2017.  Defendant Brownstein followed two weeks later, resigning from his position as Lead Independent Director.  Seabold, Executive Vice Chairman at Banc, also resigned his position.

**<u>WRONGDOING CONTINUES TO EMERGE</u>**

58.    Following these Board actions, Banc insiders filed wrongful termination complaints alleging that the Special Committee's process was also bereft with conflicts of interest and a desire to suppress accounting manipulations.

59.    Particularly, in a lawsuit for wrongful termination, Seabold alleged that Special Committee members Sznewajs, Benett, Karish, and Schnel engaged in a "power

- 21 -

grab" seeking a scapegoat in defendants Sugarman and Brownstein for their own conflicts and transactions. Seabold asserts that these Board members sought to push out Company whistleblowers, officers, and directors that sought to ensure compliance with disclosure and financial reporting requirements.

60.     In Seabold's complaint, he claims that defendant Benett did not disclose his relationship with Banc through his former employer KBW, Inc., an investment banking firm that worked with the Company in 2014. According to Seabold, the Board's Joint Nominating and Governance Committee headed by defendant Schnel failed to take similar action against defendant Benett for his nondisclosure as the Board did against Seabold and defendant Sugarman.

61.     Seabold also asserts that defendant Karish had connections to defendant Brownstein while he was employed at Heritage Group, an investor in a business owned by defendant Brownstein. Seabold further alleges that defendant Karish served on a board of directors of a company alleged of fraudulent business practices, a fact not disclosed to Banc's Board. Whistleblowers disclosing defendant Karish's connections to prior breaches of fiduciary duties were pushed out of Banc.

62.     Seabold likewise claims that defendant Sznewajs suffers from conflicts of interest. Despite serving as the Chairman of the Joint Audit Committee, Seabold states that defendant Sznewajs did not disclose to the Company that his committee approved the hiring of his son's firm to underwrite a Company offering.

63.     Banc insiders also claim that the Company's management artificially inflated Banc's first fiscal quarter of 2017 ("Q1 2017") financial results through accounting manipulation, with the tacit approval from the defendant Sznewajs-led Joint Audit Committee. Seabold claimed that Banc faced an operating results shortfall in Q1 2017. In particular, Seabold alleged that Company fiduciaries knew that the Company would miss earnings estimates and sought to artificially generate revenue to conceal it. Publicly, the Company reported that earnings per share remained at $2 for the fiscal year. Behind the scenes, Company fiduciaries conducted a "reassessment" for the accruals for

2016 bonuses.   Using sham accounting methods, Seabold alleges that the Company reversed $7.8 million in accruals attributed to liabilities accrued in Q1 2017 to meet earnings per share expectations.   Another former officer, Endresen, corroborated that this manipulation occurred.   Endresen and Seabold were not paid their full bonuses as a result of this manipulation.   When Endresen and Seabold brought their concerns regarding the material weakness in the internal controls over the Company's financial reporting, they allege Company fiduciaries retaliated by effectively forcing their respective resignations.

64.   Further, Seabold averred that Banc's new leadership brought in after the "power grab" eliminated transparency in financial reporting and budgeting processes, turning off Sarbanes-Oxley Act ("SOX") compliance reports to management.   Endresen states she encountered similar resistance to ensure effectiveness of Banc's internal controls.   For example, Endresen claims she met with interim CEO Hugh Boyle ("Boyle"), Director of Human Resources Michael Urtel, Chief Internal Audit Officer Michael Gellormino, and defendant Lashley about the Company's SOX violations.   In response, Endresen claims she was deprived of her bonus and subject to a culture of fear and retaliation that forced her from her position.

65.   The Company's own admissions confirm that fiduciaries oversaw faulty financial reporting with significant material weaknesses in Banc's internal controls.   In its 2017 Annual Report on Form 10-K filed with the SEC on February 28, 2018, the Company acknowledged that KPMG noted such material weaknesses requiring the Company to engage in remediation efforts through the end of fiscal year 2017.

66.   Additionally, Endresen alleges that Banc upended management, inserting Francisco Turner ("Turner") as Interim President and Chief Financial Officer who consistently violated SOX and the Company's Code of Business Conduct and Ethics. Among the shocking allegations, Endresen claims that Turner was not only involved in the accounting manipulation described above, but misused Company funds to pay for employees, clients, and analysts to go to strip clubs.   Turner's toxic "tone at the top" included use of drugs and sexual activity at work, according to Endresen.

67.     Both Endresen and Seabold also allege that those responsible for the illegal activity, including Boyle, defendant Sznewajs, and Turner, were rewarded with promotions instead of disciplined.  Some of these individuals still hold top positions with the Company, including defendant Sznewajs as Banc's Chairman of the Board. Boyle just resigned as the Company's Chief Risk Officer on May 17, 2019.

### THE MISLEADING PROXY

68.     On April 15, 2016, the Board, at that time consisting of defendants Benett, Brownstein, Holoman, Karish, Schnel, Sznewajs, and Sugarman, filed the Company's Proxy with the SEC.  The Proxy solicited stockholder votes in favor of the reelection of defendants Sugarman and Schnel to the Board and an advisory vote on executive compensation.   In soliciting these votes, the Proxy contained false and misleading statements regarding defendant Sugarman's biography.

69.     In particular, the Proxy stated:

Mr. Sugarman is the Chair, President and Chief Executive Officer of the Company. Mr. Sugarman has served as a director of the Company and the Bank since November 2010, Chief Executive Officer of the Company since September 2012 (and for a month prior, acted as co-Chief Executive Officer of the Company) and President of the Company and President and Chief Executive Officer of the Bank since November 2013. Mr. Sugarman continues as the Chief Executive Officer and director of COR Securities Holdings Inc., the parent company of COR Clearing LLC (of which he is Chair of the Board), a national securities clearing firm, and remains the Managing Member of COR Capital LLC, a Southern California-based firm that was a lead investor in the November 2010 recapitalization of the Company. Prior to that, Mr. Sugarman was a founding partner of GPS Partners LLC, a $2 billion investment firm. Previously, Mr. Sugarman worked at Lehman Brothers; founded and serves as Chief Executive Officer of Sugarman Enterprises, Inc.; and founded The Law Offices of Steven

Sugarman, Inc.  Mr. Sugarman began his career as a management consultant at McKinsey & Company and is a graduate of the Yale Law School and Dartmouth College.

\* \* \*

Mr. Sugarman's experience in running the day-to-day operations of the Bank and in capital markets and investment matters makes him a valued member of the Board.

70.     The Proxy also claimed that the Board reviewed "all relationships between the Company and each Director and Director Nominee and has affirmatively determined that, with the exception of [defendant] Sugarman, who is a Company employee, each non-employee director … has only immaterial relationships with the Company, and accordingly each has been determined to be independent under these standards."

71.     The Proxy was misleading, however, because it failed to disclose the ties between defendant Sugarman and Galanis, that Galanis was using COR and its related entities in his Tribal Bond Scheme, and the connection between defendant Sugarman, Galanis, Camden, and Prospect Global.

## THE TRUTH EMERGES

72.     On October 18, 2016, *Seeking Alpha* published a blog post written by a short seller under the pseudonym Aurelius titled, "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investable." As explained above, the blog post detailed the connections between Galanis, defendant Sugarman, and COR.

73.     On this news, Banc's market capitalization plunged almost 30% or $4.62 per share, on October 18, 2016, to close at $11.26 per share compared to the previous trading day's closing of $15.87 per share, erasing almost $230 million in market capitalization in a single day.

## THE SECURITIES CLASS ACTION

74.     On January 23, 2017, investors in the Company's stock filed a securities class action against the Banc, defendant Sugarman, and James J. McKinney.

75.   On September 6, 2017, the court denied, in part, the defendants' motion to dismiss the securities class action.  In particular, the court held that the plaintiff in the securities class action adequately alleged that the Proxy describing defendant Sugarman was materially misleading.

76.   The court also held that defendants made the false statement in the Proxy with the requisite scienter, i.e., defrauded either "intentionally or at least with deliberate recklessness."

77.   On May 31, 2018, the court granted the plaintiff's motion for class certification.  In particular, Judge Guilford certified a class of:

> All persons and entities who purchased or otherwise acquired the common stock of Banc of California, Inc. ("Banc" or the "Company") during the period from April 15, 2016 through January 20, 2017, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants, present or former executive officers and directors of Banc and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

78.   The securities class action is now barreling towards a trial that is currently set to start on February 18, 2020, exposing the Company to massive damages.

## DAMAGES TO BANC

79.   As a result of the Individual Defendants' improprieties, Banc disseminated improper, public statements.  These improper statements have devastated Banc's credibility as reflected by the Company's over $587 million, or 51%, market capitalization loss.

80.   Banc's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Banc's current and potential customers consider a company's ability to truthfully present its officers and other key personnel.  Businesses are less likely to award contracts to companies that have deceived and have been deceived by these key personnel.  Banc's ability to raise equity capital or

- 26 -

debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

81.  Further, as a direct and proximate result of the Individual Defendants' actions, Banc has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)  costs incurred from defending and paying any settlement in the securities class action for violations of federal securities laws;

(b)  costs incurred from litigation regarding the bonus accruals manipulation;

(c)  costs incurred from investigating the *Seeking Alpha* blog post's allegations; and

(d)  costs incurred from compensation and benefits paid to the defendants who have breached their duties to Banc.

## DERIVATIVE AND DEMAND REFUSE ALLEGATIONS

82.  Plaintiff brings this action derivatively in the right and for the benefit of Banc to redress injuries suffered, and to be suffered, by Banc as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Banc is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.  Plaintiff will adequately and fairly represent the interests of Banc in enforcing and prosecuting its rights.

84.  Plaintiff was a stockholder of Banc at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Banc stockholder.

85.   The Board had an affirmative duty under Maryland law to conduct a reasonable, objective, and good faith investigation into the allegations in plaintiff's Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.  The Board failed in this duty.

86.   On May 22, 2018, on behalf of plaintiff, plaintiff's counsel sent the Demand to the Board, detailing the wrongdoing described herein, and demanding that the Board investigate and bring claims arising from the wrongdoing against those fiduciaries responsible for damaging the Company, including certain of the Company's current and former officers and directors.  The Demand also demanded that Banc institute certain corporate governance reforms.

87.   Plaintiff received a response from counsel ***for the Company***, the same counsel that represented a number of the individual defendants in the securities class action.  Counsel stated that it was evaluating the Demand and requested documentation demonstrating plaintiff's proof of ownership of Banc of stock during the relevant period.  Plaintiff provided the requested proof in response.

88.   On July 5, 2018, counsel for the Company wrote to plaintiff and informed him that it recently received another litigation demand letter and that this letter would be considered at the same time as the Demand and a previously unreferenced ligation demand, "[b]ecause of the overlap between the allegations raised in the three demand letters."  Plaintiff e-mailed counsel in response that same day asking for a copy of the other two litigation demand letters.  Counsel never responded.

89.   On August 27, 2018, plaintiff received a letter from the Company's in-house counsel, Angelee J. Harris, stating that "Banc of California, Inc. … is considering [the Demand]."  Notably, Ms. Harris stated that the Company, not the Board, was considering the Demand.

90.   Plaintiff responded to Ms. Harris on September 5, 2018, through his counsel. He noted that he was previously contacted by the Company's outside counsel and asked

- 28 -

whether to direct future conversation to the outside counsel or Ms. Harris.  Plaintiff also asked whether the Board had retained its own independent counsel. Finally, plaintiff noted he never received a response to his request on July 5, 2018, for copies of the other outstanding litigation demand letters.   Ms. Harris never responded to plaintiff's September 5, 2018 letter.

91.    On October 9, 2018, plaintiff's counsel received an e-mail from yet another counsel, John D. Pernick of the law firm Bergeson, LLP ("Bergeson").  Mr. Pernick stated that Banc was considering plaintiff's Demand and that he was retained to assist in this consideration.  Notably, yet again, counsel presented it as the Company, not the Board or a committee of the Board, as considering the Demand.

92.    Plaintiff responded that same day, highlighting that: (i) he had not received a response to his previous requests to review copies of the other litigation demand letters; (ii) the Demand was sent to the Board, not the Company, and it was members of the Board that needed to consider the Demand; and (iii) nearly five months had passed since plaintiff made his Demand.

93.    Mr. Pernick responded by e-mail that same day.  In contrast to his earlier statement about assisting the Company in its consideration of the Demand, Mr. Pernick claimed that he was engaged by "the special committee of the Board of Directors of the Banc."  This was the first time any of the various lawyers that corresponded with plaintiff mentioned a "Special Committee" of the Board.  Mr. Pernick also asked why plaintiff was interested in reviewing the other litigation demand letters and whether his counsel was available for a call.

94.    Plaintiff explained in response that he was consistently told that the other demands were related to his, without any description of whether the demands focused on the same issues and facts.  He also requested that counsel inform him of the identities of the members of the Special Committee.

95.    Counsel's response to plaintiff's requests was merely that he would "get back to [plaintiff] with respect to your other requests."

96.    Plaintiff responded with his significant concerns about the claimed investigation in the Demand.  In particular, after five months of counsel ignoring plaintiff's letters and e-mails, he was suddenly told it was imperative that counsel speak with him immediately.  In addition, counsel refused to provide even basic information about the newly constructed "Special Committee," including even the names of the members of the committee.  Plaintiff also explained that he currently had no idea of the scope of the Special Committee's duties.  Accordingly, plaintiff requested that counsel provide the Board minutes and resolutions creating the Special Committee, appointing the members of the Special Committee, and delineating the scope of the investigation of the Special Committee.  In light of the above-described stonewalling and the supposed "investigations" that had previously occurred, allegedly, at least initially, overseen by the Board, this information was needed to show whether the Board was engaging in a good faith review of the Demand.  Plaintiff explained that he would wait until review of the information before scheduling the call.

97.    Mr. Pernick wrote back ignoring plaintiff's requests.  Plaintiff responded again explaining how he has consistently provided whatever information the Company requested while the Company's various counsel ignored his overtures, a pattern continued by Mr. Pernick.   Plaintiff's response stated:

> In light of this refusal to act cooperatively, we fail to how your request to talk could be a good faith attempt to find information about an investigation that we cannot even tell the special committee is appropriately empowered to investigate.

98.    Plaintiff did not receive a response to his e-mail.  He never received copies of the other litigation demand letters that the "Special Committee" considered at the same time as the Demand.  He also never received copies of the minutes of the Board or other authorization of the Special Committee.  In fact, plaintiff heard nothing about the Demand until January 4, 2019.

99.    On that day, plaintiff received a letter from defendant Sznewajs, writing as Chairman of the Board, on Company letterhead, rejecting the Demand (the "Rejection Letter").   In contrast to the previous claims, explicit and implied, that there was a duly formed "Special Committee" investigating the Demand, defendant Sznewajs stated that the Board formed an "Ad Hoc Committee," consisting of Kirk Wycoff, Mary Curran, and Bonnie Hill.  The Rejection Letter did not provide any details on the formulation of this Ad Hoc Committee, such as why these particular members of the Board were selected to serve on the committee, what steps were taken to ensure that there were no improper conflicts, and what powers the Board imbued this Ad Hoc Committee.  The Rejection Letter did state that the Ad Hoc Committee's investigation took ten weeks.  The Ad Hoc Committee presented its findings to the Board on November 20, 2018.  Assuming the investigation ended somewhat contemporaneous with this presentation, this means that the Board sat on the Demand for nearly four months before investigating it.

100.   The Rejection Letter stated that the Special Committee hired Bergeson to assist in its investigation.  Bergeson, however, previously identified itself as assisting the Company in an investigation in the Demand.  It is the same law firm that refused to provide any information about the "Special Committee," that was really an "Ad Hoc Committee."

101.   The Rejection Letter stated that the Ad Hoc Committee presented its findings and recommendation to the full Board in a written report and that the Board adopted the report and recommendation of the Ad Hoc Committee.

102.   The Rejection Letter was notable in its lack of detail.   Concerning the investigation, the Rejection Letter fails to detail which witnesses it interviewed or, with any specificity, what documents the Ad Hoc Committee reviewed.  It also failed to describe what role management and its counsel played in the review of the Demand, a particularly salient question in light of plaintiff having to deal repeatedly with counsel that claimed to represent or assist "Banc," not the Board, in the investigation.   The Rejection Letter provided no information concerning key facts underlying the merits of

1  its decision, such as who was responsible for the October 18, 2016 press release that

2  falsely claimed that the Board oversaw the initial flawed investigation;

3      103.    On February 25, 2019, plaintiff sent a letter to the Company demanding to

4  inspect certain books and records related to the Rejection Letter.  In particular, plaintiff

5  demanded to inspect:

6      [•]   All meeting minutes of the Board or committee of the Board tasked

7            with reviewing our client's litigation demand (the "Review Committee")

8            where our client's litigation demand was discussed or evaluated.

9      [•]   All meeting minutes of the Board or Review Committee concerning the

10           potential appointment of a special committee tasked with investigating

11           the allegations raised in our client's litigation demand.

12     [•]   Any written report or presentation to the Board or Review Committee

13           concerning our client's litigation demand.

14     [•]   All documents reviewed or relied upon by the Board or Review

15           Committee concerning our client's litigation demand.

16     [•]   The engagement letters of any experts retained by the Board or Review

17           Committee concerning our client's litigation demand.

18     [•]   All documents concerning the steps the Board and Company have taken

19           in response to the broader concerns raised by our client's litigation

20           demand.

21     104.   The Company refused to provide the documents demanded, stating that it

22  had no legal obligation to do so, on March 20, 2019.

23     105.   On April 11, 2019, plaintiff responded to Banc's rejection of his inspection

24  demand.  In his letter, plaintiff explained that by the Company refusing to provide the

25  demanded books and records, it amounted to an improper attempt to prevent scrutiny of

26  the decision to reject the Demand, citing *City of Orlando Police Pension Fund v. Page*,

27  970 F. Supp.2d 1022, 1030 (N.D. Cal. 2013).  Plaintiff requested that the Company

28  reconsider its position.

1   106.   Ignoring plaintiff's directly on point citation, on May 8, 2019, the Company
2   reiterated its rejection.

3   107.   In light of the Company's, Board's, and Ad Hoc Committee's actions
4   described above, the only reasonable assumption was that the Ad Hoc Committee was not
5   a fully empowered committee, tasked with reviewing the issues identified in the Demand
6   and the Company and Individual Defendants are acting to prevent any true review of the
7   wrongdoing detailed herein.   This inference is supported by the Ad Hoc Committee
8   having to present its findings to the Board.   The Board, however, consisted of a majority
9   of conflicted directors.   Accordingly, since any action had to run through these conflicted
10   directors, the Ad Hoc Committee was not duly formed and merely a fig leaf for the
11   Individual Defendants' wrongful actions.

12   108.   Plaintiff has not made any demand on the other stockholders of Banc   to
13   institute this action since such demand would be a futile and useless act for at least the
14   following reasons:

15           (a)   Banc is a publicly held company with over 50.3 million shares
16   outstanding and thousands of stockholders as of May 6, 2019;

17           (b)   making demand on such a number of stockholders would be
18   impossible for plaintiff who has no way of finding out the names, addresses, or phone
19   numbers of stockholders; and

20           (c)   making demand on all stockholders would force plaintiff to incur
21   excessive expenses, assuming all stockholders could be individually identified.

22   ## COUNT I

23   **Against the Individual Defendants for Breach of Fiduciary Duty**

24   109.   Plaintiff incorporates by reference and realleges each and every allegation
25   contained above, as though fully set forth herein.

26   110.   The Individual Defendants owed and owe Banc fiduciary obligations.   By
27   reason of their fiduciary relationships, the Individual Defendants owed and owe Banc the
28   highest obligation of good faith, fair dealing, loyalty, and due care.

- 33 -

111.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Banc, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

112.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Banc has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

113.   Plaintiff, on behalf of Banc, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

114.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Banc.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Banc.

116.   Plaintiff, as a stockholder and representative of Banc, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

117.   Plaintiff, on behalf of Banc, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Banc, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.     Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Banc and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen the Company's controls over conflicts of interests among fiduciaries;

2.     a proposal to strengthen the Company's controls over hiring of key employees;

3.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.     a provision to permit the stockholders of Banc to nominate at least three candidates for election to the Board; and

5.     a proposal to strengthen Banc's oversight of its disclosure procedures;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Banc has an effective remedy;

D.     Awarding to Banc restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

- 35 -

1

**<u>JURY DEMAND</u>**

2          Plaintiff demands a trial by jury.

3    Dated:  June 10, 2019                        ROBBINS ARROYO LLP
                                                  BRIAN J. ROBBINS
4                                                 CRAIG W. SMITH
                                                  ASHLEY R. RIFKIN
5

6                                                       */s/Brian J. Robbins*
                                                    BRIAN J. ROBBINS
7
                                                  5040 Shoreham Place
8                                                 San Diego, CA 92122
                                                  Telephone: (619) 525-3990
9                                                 Facsimile: (619) 525-3991
                                                  E-mail: brobbins@robbinsarroyo.com
10                                                         csmith@robbinsarroyo.com
                                                           arifkin@robbinsarroyo.com
11
                                                  Attorneys for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   1357977

28

- 36 -

<u>VERIFICATION</u>

I, Donald Johnston, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6/7/2019

DONALD JOHNSTON



JEFFREY LEE BROWNING
Notary Public, State of Ohio
My Commission Expires
April 18, 2021